DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**LUKE CHAMBERLAIN,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D15-4048

[September 12, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Martin J. Bidwill, Judge; L.T. Case No. 11014892CF10A.

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Melynda L. Melear, Assistant Attorney General, West Palm Beach, for appellee.

WARNER, J.

Appellant challenges his conviction and sentence for first degree murder. He raises multiple issues on appeal. We conclude that no reversible error has occurred, but we write to address one issue: whether the trial court erred in determining that the defense was not prejudiced by the State's failure to reveal fingerprint testing prior to trial and in concluding that no *Richardson*[1] violation occurred when the State conducted further DNA testing during trial. While we hold that a discovery violation did occur in each instance, we agree with the trial court that the defense was not prejudiced, and thus, the court's error in finding no discovery violation was harmless. We therefore affirm the conviction and sentence.

The victim, Antoine Gracius, was a cook at TGI Fridays in Pembroke Pines. On the evening of his murder he worked the late shift. When the restaurant closed, Gracius left through the front door and was attacked as

_____

[1] *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

he walked to his car.  Gracius was stabbed multiple times.  After he was stabbed, he tried to go back to the restaurant.

Another employee came out when Gracius banged on the door.  Gracius said to him, "Get the tag."  The employee looked and saw a dark colored or black minivan or SUV, speeding away and heading south on University Drive.  However, the car's lights were not on, so there was no tag light.  He didn't get the tag number, but he remembered scratches or some kind of linear damage on the right-hand side of the car.  He ran back to Gracius, who said, "They stabbed me."

The manager of the restaurant saw Gracius stumbling and bleeding heavily.  He heard the squeal of tires and saw a black minivan speeding away.  He noticed that there was damage on the back, sliding door of the car's passenger-side.  He saw a person in the passenger seat that he believed was African American.  He could not provide a description of the driver.

Gracius was transported to the hospital where he died of his injuries.

A second employee at TGIF left the restaurant about twenty minutes prior to Gracius leaving and was talking to another employee in his car behind the restaurant.  A man banged on the window, holding his arm behind his back, and asked for money.  This second employee described the man as being a white male with a bald head and blue eyes.  The man tried to get the second employee to roll his window down.  The employee became frightened, told him he didn't have any money, started his car, and drove away.  Four months later, police placed a photo of the defendant, Chamberlain, in a lineup, and the employee picked him as the person who had asked for money that night.  Once identified, the investigators located Chamberlain and obtained DNA samples from both him and his fiancée.  When confronted by his fiancée as to his involvement in the murder, he told her he did not remember whether he had killed someone.  The fiancée also had a van similar to the van seen at the murder scene.  The investigators were able to locate that van and process it, but they found no evidence tying it to the murder.

At the crime scene, investigators found a broken piece of yellow metal jewelry on the running board of Gracius's car.  Another piece was found on the ground in Gracius's parking space.  Gracius wore a similar necklace.  A separate silver necklace was also found.  Police found a black South Pole T-shirt at the scene in a pool of blood, as well as two separate drops of blood twenty feet from where Gracius stopped after the stabbing.  A DNA expert testified that these blood drops matched the defendant

2

Chamberlain's DNA. The black shirt found at the scene had Chamberlain's fiancée's DNA on it at the collar. The fiancée testified that she had given Chamberlain South Pole T-shirts, but she wore them around the house because he did not wear them. There was a mixture of DNA on the silver chain, but Chamberlain was excluded from contributing to the DNA on it. The mixture was most likely the DNA of Gracius and another unknown person. DNA from the right arm of the black shirt could have been a mixture of DNA from Chamberlain, his fiancée, and Gracius. On cross-examination, the defense brought out that the swabs of Gracius's fingernails revealed no DNA of Chamberlain, nor was any of Chamberlain's DNA found on any other part of Gracius's body.

In opening statements, defense counsel suggested that Gracius was not a victim of a robbery and murder, but he may have struggled with someone he knew—someone was "targeting" Gracius. Particularly, he pointed to the silver chain which did not belong to Gracius and had a mixture of Gracius's DNA and some unknown person's DNA, but not Chamberlain's. He also tied this unknown person to the manager's statement that he saw an African American in the passenger seat of the getaway van, and the video showed a white arm in the window on the driver's side. He told the jury that an African American had come up to Gracius's co-worker in a restaurant several days after the murder and told him that one of his friends had killed Gracius. Briefly, defense counsel suggested that the State might maintain that the unknown DNA on the silver chain could be that of restaurant employees who may have picked up the chain, but there was no evidence that the State would produce, as the employees never were asked to give DNA samples to exclude them as contributors. While there was a lot of disparate evidence, including video and DNA evidence, there was no fingerprint evidence, no forensic evidence found in the fiancée's van, and no eyewitnesses. There were significant gaps in the evidence, which meant that the State would fail to prove its case.

In addition, during opening statement, defense counsel noted that there were fingerprints on Gracius's vehicle, but the State had never tested those prints. Although the defense knew that several latent fingerprints had been taken in the investigation, the State had failed to inform the defense that an expert had examined these prints and determined that they were insufficient to identify. Because of the defense argument, the State sought to call its expert examiner, even though he had not been listed as a witness. Defense objected, and the court conducted a *Richardson* inquiry. While it found that the failure to provide the examiner's report (which was verbal, not written) was inadvertent, the defense was harmed by the omission. Rather than exclude the State's expert from testifying, the court

granted a month's continuance to the defense to depose the expert and to obtain, if necessary, its own expert.

During the recess in the trial, the State conducted further DNA testing of the employees of TGI Fridays who may have touched the silver necklace. None of them were found to have contributed to the DNA on the necklace. Once the testing was completed, the defense was immediately notified.

At the resumption of the trial, the defense made a *Richardson* objection to the additional testing. It claimed that this prejudiced them by requiring them to change their theory of defense, which was the State's lack of evidence. Now the State had produced new evidence mid-trial. The court rejected the *Richardson* challenge, because the State had not tested the blood until the recess in the trial and had promptly turned over the results to the defense. Thus, the State did not fail to disclose any evidence to the defense. Further, the court found no prejudice and possibly some benefit to the defense because the evidence excluded the co-workers as sources of the unknown DNA.

As explained in the opening statement, the defense's main theory was that Gracius struggled with an unknown person, likely an African American, whom he may have known. The defense did not rely exclusively on the State's lack of evidence. It presented a substantial case that another person or persons killed Gracius. Another co-worker of Gracius testified that on an evening shortly after the killing, he was eating at a restaurant when another customer came to their table to inform them that one of his friends had killed Gracius. Two other persons at the table that night also testified to the exchange. In addition, Chamberlain's fiancée testified and named a girlfriend and her boyfriend who had stayed with them, who may have taken the black shirt, and who had access to the fiancée's van.

The jury found appellant guilty of first degree murder, and the court sentenced him to life in prison. He appeals.

Appellant contends that the court abused its discretion in finding that no discovery violation occurred because of the State's mid-trial DNA testing, as well as the court's decision to allow the fingerprint examiner to testify regarding fingerprint findings. Once the court has notice of a discovery violation, the court is obliged to conduct a *Richardson* hearing. *Holley v. State*, 48 So. 3d 916, 920 (Fla. 4th DCA 2010). If the court finds a discovery violation, it must determine whether it was willful or inadvertent, substantial or trivial, and whether the aggrieved party has

4

suffered prejudice. *Richardson v. State*, 246 So. 2d 771, 775 (Fla. 1971). However, a *Richardson* violation may be found to be harmless.

> In determining whether a *Richardson* violation is harmless, the appellate court must consider whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense. As used in this context, the defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred.

*State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995). We review the trial court's determinations with respect to these issues for an abuse of discretion. *See Dabbs v. State*, 229 So. 3d 359, 360 (Fla. 4th DCA 2017).

With respect to the fingerprint evidence, the State conceded that it had not furnished the fingerprint examiner's findings as to the latent fingerprints to the defense. The trial court permitted a month's recess for the defense to conduct additional discovery on the issue. After the trial resumed and the subject was thoroughly reviewed, the trial court found that the violation was not misconduct, was not substantial, and did not result in procedural prejudice, nor was it willful. Further, the defense counsel had told the jury in opening that there was forensic evidence on the victim's vehicle and he would be asking questions to see what was done with the vehicle. Counsel hadn't argued that there was no analysis of the forensic evidence. Thus, the defense's theory was not impeded by the introduction of the evidence of latent prints, particularly when they were not useable. In fact, the lack of prints identifiable to the defendant would help his case, not harm it. Therefore, we conclude that no abuse of discretion occurred.

As to the DNA evidence produced mid-trial, appellant contends that this was a discovery violation which harmed his case. Generally, where the State does not reveal additional witnesses or evidence until the eve of trial or during trial, a discovery violation occurs. In *Mobley v. State*, 705 So. 2d 609, 611 (Fla. 4th DCA 1997), we noted that "Waiting until the eve of trial to conduct an investigation that then reveals an additional witness is not the type of discovery violation that would generally be deemed inadvertent." *Id.* at 611. In *Dabbs v. State*, 229 So. 3d 359 (Fla. 4th DCA 2017), we also found a discovery violation where the State produced additional evidence after the commencement of the trial. There, Dabbs was charged with killing his co-worker. *Id.* at 360. He did not dispute that he killed the co-worker but claimed that the co-worker threatened

him, whereupon Dabbs wrestled the gun from him and shot him. *Id.* In opening statements, defense counsel claimed the co-worker owned two or three guns. *Id.* However, the State surprised the defense by overnight acquiring documents and a witness to establish the current location of all of the victim's known guns, which tended to show that the gun used in the shooting could not have been one of the co-worker's own guns. *Id.* The defense claimed a discovery violation, and the court conducted a *Richardson* hearing, determining that the violation was not willful and was trivial.

On appeal, we reversed because the documents and additional witnesses removed any possibility that the jury would conclude that the gun belonged to the co-worker, and thus, the evidence severely impacted Dabbs's claim of self-defense. *Id.* at 361. We found at least a reasonable possibility that his defense strategy would have changed. *Id.* Applying *Dabbs*, Chamberlain argues that the trial court erred in concluding there was no discovery violation in his case. He asserts that he would not have made the opening statement had he known that the State would include this additional evidence.

We conclude that the trial court abused its discretion in finding that no discovery violation occurred. "Florida's criminal discovery rules are designed to prevent surprise by either the prosecution or the defense. Their purpose is to facilitate a truthful fact-finding process." *Kilpatrick v. State*, 376 So. 2d 386, 388 (Fla. 1979). Here, prior to trial, the State had not conducted DNA testing of the co-workers. The defense suggested in opening that the State could not argue that the DNA of the unknown person on the silver chain could be DNA of a co-worker, because they had not tested for the co-worker's DNA. After opening, the prosecutors decided to use the continuance period to obtain additional testing. They tested the co-workers and determined that none of their DNA matched the unknown DNA on the silver chain. This constitutes a discovery violation which the rules are intended to prevent. *See Mobley*, 705 So. 2d at 610-11. It is clearly not inadvertent, because the State acknowledged that it decided to obtain this additional evidence after listening to the defense's opening statement questioning the thoroughness of the investigation. Thus, it was a willful violation of the discovery rules.

The question is whether it was harmless beyond a reasonable doubt or whether it procedurally prejudiced the defendant in his trial preparation and strategy. The trial court did not abuse its discretion in finding that there was no prejudice to the defendant. The court noted that defense counsel had made only a couple of generalized claims during opening argument, saying that a lack of evidence would leave the jury with

6

reasonable doubt, and that argument held up after the subsequent evidence testing.  The additional testing actually enhanced the defense's theory of the case.  Instead of the State being able to argue that the DNA on the chain could be that of one of the co-workers, thus eliminating the "unknown assailant" theory of the defense, the additional DNA testing made that theory stronger.  *Dabbs* is distinguishable because there, the new evidence ruined the argument that the defense counsel made in opening statement, whereas in the present case, the new DNA and print testing supported the theory that the defense had offered in opening statement.  Thus, although the court erred in finding that no discovery violation occurred, we agree with the court that no prejudice has been shown.  The error is harmless beyond a reasonable doubt.

No reversible error is presented in the remaining issues.  We thus affirm Chamberlain's conviction and sentence.

MAY and FORST, JJ., concur.

*　　*　　*

***Not final until disposition of timely filed motion for rehearing.***

7